First National Bank of Pittston, Appellant, *v.*
Monarch Fire Insurance Co. of Cleveland.

Argued March 3, 1936.

Before Keller, P. J., Cunningham, Baldrige, Parker, James and Rhodes, JJ.

*W. L. Pace,* for appellant.

*Walter Hill,* of *O'Malley, Hill, Harris & Harris,* with him *James P. Harris,* for appellee.

Opinion by Keller, P. J., September 30, 1936:

The action was in assumpsit on a fire insurance policy for $3000. Both parties appealed. The plaintiff's complaint is double-barreled: It assigns as error, (1) the refusal of the court to grant a new trial, because the verdict of the jury ($2125 and interest) was insufficient and showed a capricious disregard of the uncontradicted testimony as to damages; and (2) the action of the court in reducing this already insufficient verdict and entering judgment for $1600 and interest. The defendant appeals from the discharge of its rule for judgment non obstante veredicto.

The facts are out of the ordinary and will have to

be carefully kept in mind in applying the legal principles involved.

The property insured was a dwelling house, but it was not real estate. It was erected on leaśed ground and was removable during the continuance of the lease at the will of the owner of the building. It was personal property. The insurance policy so recognized it, for in describing the insured premises, it read: "Building on leased ground from Pittston (sic) Coal Co."

The land belonged to the Pennsylvania Coal Company. It was located in Pittston Township, Luzerne County, in a section of the Coal Company's land commonly known as Browntown. The Coal Company leased the surface of the ground, reserving the coal underneath, with the right to remove the same without liability for surface support. A woman named Hannah Mullen owned a two-story frame dwelling, erected on the front half of Lots 129 and 131, owned by the Coal Company, for which she held a lease. She had bought the house and secured a lease of the ground in 1913 or 1914. In October 1921 John Asakavage and his wife, Frances, were desirous of purchasing this house, which they could obtain for $1800. They had $500 saved and arranged with this plaintiff, First National Bank of Pittston, to finance the transaction. If it had been a real estate transaction the money could have been borrowed and secured by mortgage or judgment on the premises. But the house being only personal property a mortgage or judgment would have given the bank no security. They adopted the only feasible method,—one that is in use in localities where the owner of land will not sell, but will only lease it, and which has also been applied for years in this State in the financing of personal property which a person with insufficient funds to pay for it desires to buy. The bank agreed to buy the house and take an assignment of the lease for the

ground, and lease them both to the Asakavages, the complete title to remain in the bank until they had paid the full amount advanced by it, with interest on the same, the rent payable to the ground landlord, taxes, water rents, insurance and all repairs to the building. When the amount advanced was fully paid, together with the other items above-mentioned, the house would become the property of the tenants, Mr. and Mrs. Asakavage, and the bank would execute and deliver to them a bill of sale for the house and an assignment of the lease for the lot of ground. No other feasible method has been devised for safely financing such a transaction in like circumstances, and it is not in contravention of any law or policy of this State.

Accordingly on October 29, 1921 the bank plaintiff paid Miss Mullen $1800,—of which John Asakavage had furnished $500—and received from her a bill of sale conveying to it the dwelling house located at No. 124 Brown Street, Pittston Township (Browntown), on the first half of Lots 129 and 131 of the Pennsylvania Coal Company together with the ground rent lease and leasehold interest aforesaid. On December 23, 1921, the bank secured from the Coal Company, owner of the said lot, a lease for the surface or soil thereof for the term of three months, at the annual rental of six dollars per year payable quarterly in advance, with provisions for renewal from year to year, and the right to remove the dwelling; and on March 18, 1925, a supplemental agreement was made between the bank and the Coal Company for a term of one year from April 1, 1925, increasing the rent to $18 per year payable quarterly, but with no other changes, and with the same rights of renewal from year to year and removing the dwelling house.

In the meantime, on October 29, 1921, immediately after it purchased the dwelling house and ground lease from Miss Mullen, the bank executed a lease for the

same to John Asakavage and Frances Asakavage, his wife, for the term of twenty-six months from date, under which the lessees were to pay the bank lessor as rental the sum of $50 on November 29, 1921 and $50 on the 29th day of every month thereafter during said term, and as further rental, 6% interest on the sum of $1300 and unpaid balances thereof, and the ground rent due the Coal Company owner, and all water rent, taxes, insurance on the dwelling house in the name of the owner, and all necessary repairs to the building. The lease contained, inter alia, the following provision: "And in the event lessees strictly comply with their covenants herein made lessor at end of term without further payment will transfer to them said building and assign to them ground rent lease." The lease contained many provisions not material to this case, including a waiver of the $300 exemption and a confession of judgment for the sum of $1400.

Had the lessees made their rent payments promptly and as provided in the lease until the $1300 had been paid the present trouble probably would not have arisen. The trial judge was under the impression that they had done so, but he was clearly mistaken. Had they done it the entire rental reserved would have been paid by December 29, 1923; but "hard times came" (p. 75a) and up to August 12, 1926 they had paid only $1050 on account of the $1300, leaving a balance due on the principal of the reserved rental of $250. By this time the building needed repairs and a heating plant, which the lessees were not able to pay for. They consulted the bank, which agreed to advance $1600,—of which lessees spent $1400 on repairs to the building—upon the agreement, testified to by both the bank's officer (p. 91a) and the Asakavages (pp. 156a and 164a) that title to the building should remain in the bank as long as any of this money was unpaid. As additional se-

curity the bank took a bond and mortgage from the Asakavages for $1600 covering a lot of ground in Sullivan Park, Exeter, and a note of John Asakavage for like amount.

The last payment of the remaining $250 of the original $1300 was not made until October 16, 1931. Nothing at all was paid on the principal of the $1600 advanced on August 12, 1926 up to the date of the fire on May 1, 1932.

It seems clear from the foregoing recital of facts that if the arrangement entered into between the parties on August 12, 1926 was legal and not in contravention of law, the bank was still the legal owner of the building on May 1, 1932, when the fire occurred and entitled to recover on the policy for the damage done to the insured property, not exceeding the face of the policy.

We know of no statute or rule or policy of the law which requires such an agreement to be set aside as invalid, where both parties stand by it and no rights of creditors are affected.

Had the Asakavages paid the full rental of $1300 before August 12, 1926, a different situation would have arisen, and the position taken by the trial judge, for whose learning and judgment we have the greatest respect, would have been sustainable. The judge's view was evidently colored by his mistaken conception of the facts, for in his charge to the jury, he said: "The Bank claims that on August 12, 1926, *the $1300.00 having been repaid,* it loaned Asakavage $1600.00. He gave the Bank a note for that amount; and on the face of the note it states that the collateral to secure the payment of that $1600.00 covered this lease for this building and a mortgage on the property which they held. It seems to me there would be no trouble for you to find that the sole and unconditional ownership of this property was in Asakavage and his wife and they assigned it to the bank as collateral security to pay the money which they loaned." (Italics supplied)

Counsel for the bank called the judge's attention to the error of fact, and its corresponding error of law, contained in his statement that the $1300 had been repaid before the bank lent the $1600, but the trial judge did not apparently understand the full import of the correction and only told the jury that they were to take the testimony from the witnesses, and not from him.

This evidence was vital to the plaintiff's theory of the case. If prior to the advancement of $1600 to the Asakavages for repairs, they had paid the full rental of $1300 to the bank, the provision in the lease to them above quoted would have executed the agreement to convey the title to the building and the Asakavages would have been the real owners of the insured property; and if they had borrowed money thereafter from the bank they would only have pledged or assigned it to the bank as collateral security for the money lent. But a different result ensued where, as actually happened, the rental reserved in the lease had not been paid when the second advancement was made by the bank. The $1300 not having been paid in full, the bank was, on August 12, 1926, still the complete owner of the building and ground lease. Title had not then passed to the lessees, the Asakavages. Not being the owners of the property they did not pledge or assign it as collateral security for the loan or advancement of $1600, and all the discussion on the subject of pledges in the opinion of the court below and in the briefs of the learned counsel for the insurance company is beside the point. They made no pledge or assignment to the bank for they did not have the title nor own the building and they could not pledge what they did not own. They were in possession of the building as tenants, not as owners; and the transaction testified to by both lessor and lessees was in no sense a *pledge* of the building by the Asakavages to the bank. It was rather an agreement by them,—who had no

title to or ownership of the building and no right to demand its conveyance to them until they paid $250 more rental—with the owner of the building, that if it would advance or lend them $1600 more, to make necessary repairs to the building which the lease obliged them to pay for, title to and ownership of the building should *remain* where it then was, in the bank, until they paid to it not only the $250 yet due out of the $1300 advanced or lent in the first place, but also the $1600 advanced or lent for repairs to the building, etc. It had none of the elements of a pledge, but was an agreement that the price to be paid for a conveyance of the title should be increased by the additional amount advanced while the complete ownership of the building was in the bank. As its subject matter was personalty and not real estate it did not have to be in writing.

The Asakavages are not claiming any ownership in the building and none of their creditors are affected.

The case of *Dunsmore v. Franklin Fire Ins. Co.,* 299 Pa. 86, 149 A. 163, is wholly different from this one, as respects the pledging of the insured property. There the Hastings Coal & Coke Co. of which Dunsmore was receiver, *owned and was in possession* of the equipment of a power house plant. It borrowed $10,000 from a bank and by a bill of sale assigned to the bank the title to the contents of the power house as security for the loan, the machinery being tagged as the property of the bank, but remaining at all times in the possession of the Hastings Company. The bank insured part of the machinery for $2000, and on the property being destroyed by fire, sued on the policy and recovered a verdict and judgment for $2000. The receiver had insured the property in another company and after the fire sued that Company and recovered a verdict for $5800, which included the loss on the property insured by the bank. The Supreme Court held that as the bank, as pledgee, had been paid $2000 loss, the owner,

pledgor, was entitled to recover only $3800 and interest. Had the pledgee bank not been insured, the plaintiff Dunsmore as receiver of the owner and pledgor would have been entitled to his full verdict of $5800. If it has any application to this case it is favorable to the owner, the bank, for the Asakavages took out no insurance on the property in their name.

If a mortgage on real estate, after the mortgage debt is paid, can be kept alive for other purposes, where the parties so agree and the rights of third persons and creditors have not intervened (41 C. J. 787, sec. 895 (e) ) [1], referred to by Mr. Justice MAXEY in *Weir v. Potter Title & Mtge. Guarantee Corp.*, 323 Pa. 212, 185 A. 630, there is no rule or policy of the law which prevents one who has rented personal property which is to become his property only on full payment of certain rental installments (See *Burson v. Fire Ass'n*, 136 Pa. 267, 283, 284, 20 A. 401; *Hill v. Cumberland Valley Mut. Prot. Co.*, 59 Pa. 474, 479 [2]) from agreeing with the lessor, before the title and ownership has passed to him (the lessee) that title shall not pass until he shall have paid an additional sum of money used in the upkeep and repair of the leased property which it was his duty under the lease to keep in repair.

The nearest example, in common use, that we can

---

[1] "The parties have the right to treat the mortgage as unpaid and as standing as security for future advances, and it will be good for such advances as between themselves and as to all others not prejudiced thereby. So it may be kept alive to secure an indebtedness distinct from that which it was originally made to secure. This rule applies also to one who advances to the mortgagor the money necessary to pay the mortgage debt, under an agreement that he shall have the benefit of the mortgage security for his own reimbursement."

[2] "In our case the equity of the vendee was but partial, in relation to the property. Nobody could contend that it operated as a transfer of the entire property. It is equally certain it did not transfer any particular portion of it to him; both the title and a preponderating equity remained in the insured."

think of, at the moment, is the leasing of railroad cars and rolling stock equipment under what is known as the "Philadelphia plan". There, roughly speaking, the cars and locomotives are delivered to the railroad as lessee under an agreement that title shall remain in the owner and lessor until all installments of rental are paid to it, or if equipment trust certificates are issued against the lease, to the trustees for the equipment certificate holders. If the lessor should be one corporation there is no reason why it and the lessee could not agree, if there were no intervening countervailing rights of creditors, that money needed for the repair, etc. of the leased property should be advanced by the lessor, if done before title to the rolling stock had passed to the lessee, and that title to the leased property should not pass to the lessee until the sum so advanced as well as all unpaid installments of rental were paid. If this was done, it would not amount to a pledge of the rolling stock by the railroad lessee to the lessor, for it owned nothing that it could pledge, but rather an agreement, on sufficient consideration, for an increase or addition to the reserved rental, and that title should remain in the owner and lessor until the whole rental as thus increased should be paid.

The jury, influenced no doubt by the extract from the charge above quoted, and other portions of the charge along the same line, returned the following verdict: "We, the jury in the above case, find a verdict in favor of the First National Bank, Pittston, Pa. for $2125.00 and Interest from 60 days after the date of the Fire. The Bank to be paid the amount of its loan with the accrued Interest and the balance to be paid to the owners of the property. (In pencil): Int. $346.37 Total $2471.37." In view of what we have said above the verdict should have been received and entered in favor of the plaintiff bank for $2471.37, ($2125 with $346.37 interest), and the rest rejected as surplusage;

and, unless the court granted a new trial, as prayed for by the plaintiff, because of the inadequacy and insufficiency of the verdict, judgment should have been entered for the plaintiff on the verdict for $2471.37.

We find no reversible error in the discharge of the plaintiff's rule for a new trial. That feature of the case is governed by the decision of the Supreme Court in the very recent case of *Saxman v. U. S. Fire Ins. Co.*, 317 Pa. 13, 175 A. 394, where the judgment was affirmed on the opinion of the trial judge who said: "Plaintiff's testimony as to the valuation of the Dusenberg automobile at the time it was destroyed was $8,000; defendant's testimony as to the valuation was $4,175. Just how the jury arrived at the sum of $3,825 we are unable to figure out, but the question was for them and we cannot say the verdict is capricious, or is against the evidence, or the weight of the evidence, or that it is excessive. The motion for a new trial will be refused." In the present case the defendant offered no testimony. The plaintiff's three witnesses testified that the replacement value, new, of the building was respectively $3760, $3670 and $3818. Their estimates allowed nothing for depreciation. They knew little of the actual condition of the building just before the fire, beyond the fact that it needed painting. Their figures were based on what a new building of that size and general type would cost now; but on cross-examination they stated they would allow 10% from the cost figure for depreciation, thus reducing the figures to $3384, $3203 and $3436, respectively. Jurors are entitled to use their general knowledge of affairs in passing on the credibility of witnesses and they are not bound to find, against their own better knowledge and judgment, that a frame building, used as a dwelling house, will depreciate only ten per cent in nearly twenty years. The trial judge, who heard the witnesses, did not consider a value of $2125 on May 1, 1932, in

the circumstances here present, as arbitrary or capricious. We will not reverse his judgment on this score.

As to the appeal by the defendant insurance company, the ground relied upon for the entry of judgment non obstante veredicto in its favor is that the plaintiff was not the sole and unconditional owner of the building.

The policy itself gave notice that the building was erected on leased ground and that, therefore, the plaintiff was not the owner of the ground on which the dwelling was built. Considered as a dwelling erected on leased land, the uncontradicted evidence, as we have already pointed out, supports the position that the bank was the sole and unconditional owner at the time of the fire on May 1, 1932, when the building burned; that under the lease the payments made by the Asakavages did not constitute them pro tanto owners of the building or give them any title to any part of it until the whole amount was paid; and that it was competent and legal for them to agree in August 1926, before the whole of the rental had been paid, which was to make them the owners, that title to and ownership of the building should remain in the bank until it had been paid not only all the remaining original rental but also $1600 then advanced for necessary repairs which they had covenanted to make.

Besides, as pointed out by the court below, the agent who issued and countersigned the policy, under specific authority from the company, knew all about the transaction between the Asakavages and the bank and his knowledge affects the company. The fact that he was also the teller of the bank does not change this rule. He did not prepare the papers for the bank,—the bill of sale to the bank, the lease from it to the Asakavages, and the papers in connection with the advancement of the $1600. He arranged for the original insurance and was called in as one who could talk the

language used by the Asakavages, who were foreigners and could not speak or read English, to explain matters to them. In this capacity he acted for the Asakavages not the bank and there was nothing in the fact that he happened to be a teller in the bank, which affected the rule that the knowledge thus obtained by him was imputed to the insurance company of which he was agent in issuing the insurance. There was nothing incompatible in his being teller of the bank and at the same time agent of the insurance company.

The cases cited by the court below support its position in this respect *(Isaac v. Donegal & Conoy Mut. Fire Ins. Co.,* 308 Pa. 439, 162 A. 300; *Jabs v. Lancaster County Mutual Fire Ins. Co.,* 101 Pa. Superior Ct. 498; *Caldwell v. Fire Assn.,* 177 Pa. 492, 35 A. 612; *Damms v. Humboldt Fire Ins. Co.,* 226 Pa. 358, 75 A. 607; *Clymer Opera House Co. v. Flood City Mut. Fire Ins. Co.,* 238 Pa. 137, 85 A. 1111; *Assigned Est. of Zehring,* 4 Pa. Superior Ct. 243; *Carnes v. Farmers' Fire Ins. Co.,* 20 Pa. Superior Ct. 634; *Dunsmore, Receiver, v. Franklin Fire Ins. Co.,* 299 Pa. 86, 149 A. 163). But, from our point of view, the evidence was uncontradicted that the bank plaintiff was the sole and unconditional owner of the property insured: *Burson v. Fire Assn.,* 136 Pa. 267, 283, 284 [3], 20 A. 401.

---

[3] "I am, however, unable to see why the plaintiff was not the sole and unconditional owner of the property insured, within the meaning of the policy. The evidence is not disputed that the entire legal title to it was in the plaintiff at the time the insurance was effected, and that by the very terms of the lease or bill of sale, by whatever name it may be called, from the plaintiff to Flory, it was stipulated that the ownership should remain in the plaintiff until the last dollar was paid. It was urged, however, by the company that this transaction was a legal fraud, with the effect of making the property liable to execution on the part of the creditors of Flory; in other words, that Flory was the real owner of the property, while the plaintiff only held a bill of sale, unaccompanied by possession, and therefore worthless in law. Upon this theory the defense has been principally con-

The second, third and sixth assignments of error in plaintiff's appeal (No. 35 February Term, 1936) are sustained. The others are overruled. The judgment is reversed and is here entered for the plaintiff for $2471.37 with interest from March 19, 1935.

The assignment of error in defendant's appeal (No. 47 February Term, 1936) is overruled and the appeal is dismissed.

structed. That it will not bear examination is apparent. The insurance company is not a creditor of Flory. It has no standing to assert that the transaction is a legal fraud. It is good between the parties; it is good against all the world, except creditors of Flory, if there be any, intended to be defrauded. As between the plaintiff and Flory, and as between the plaintiff and the insurance company, the title was in the plaintiff. The fact that Flory had made payments on account to the plaintiff did not give title pro tanto to Flory. This is because they had agreed that it should not; that until the last dollar was paid the title was to remain in the plaintiff. In the mean time the goods remained the property of the plaintiff, and when destroyed by fire the loss was his." PAXSON, C. J.