Sparks's Estate.

Argued March 15, 1937.

Before KELLER,

P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ. 

*Wm. W. Hall,* with him *E. F. McGovern,* for appellant.

*Andrew Hourigan,* with him *Maurice S. Cantor,* for appellee.

OPINION BY KELLER, P. J., July 15, 1937:

Harriet Sparks, a widow, resident in Wilkes-Barre, Pennsylvania, died on July 29, 1909. She left a will, written by Mary L. Trescott, a recently employed attorney, dated April 29, 1909 and admitted to probate August 28, 1909, of which she appointed her grandniece, Sarah Carey, the executor, and letters testamentary were accordingly issued to her. By her will she gave a number of small bequests to certain charities and to a great number of collateral relatives, aggregating about $5,000; created two trust funds of $500 each, which her executor was to hold and invest during the lifetime of (1) William Jenkins and Ann Jenkins, children of her deceased sister, Sarah Jenkins, and (2) her niece, Harriet Carey, paying them the interest, respectively, with provisions for the disposition of the corpus at their deaths. We shall hereafter refer to these small trust funds as the Jenkins Trust and the Carey Trust, respectively.

As to the residue of her estate, she provided as follows: "Item. The rest and residue of my estate, real, personal and mixed, I give to my executor hereinafter named in trust for the following purposes: (a) To invest and re-invest the personal property and the money derived from the rents or sale of my real estate in such securities as to my executor and her counsel may seem advisable until after the death of my son, William Edward Sparks. (b) To use so much of the rents, issues and profits derived from said investments after payment of taxes, water rent and necessary repairs, as in the discretion of my said executor may be necessary for the boarding, clothing and maintenance of my son, William Edward Sparks, during the term of his natural life. Nothing in this devise shall be interpreted or construed to give my said son any interest in said real or personal property other than the right to receive from my said executor such support, clothing and maintenance as my said executor shall consider suitable and necessary. I particularly request my said executor to so provide my son, William Edward Sparks, with money that he may not use the same for the purchase of intoxicating liquors and, if my said son shall become addicted to the use of intoxicating liquors, then it is my direction that no money be given to my said son, but that his necessities shall be provided and paid for by my said executor. It is my desire that my said executor shall provide for my said son, William Edward Sparks, the same as a prudent parent would provide for his child. (c) After the death of my son, William Edward Sparks, to convert all of said property into money and divide the same among and to such persons who at that time would be entitled to my estate under the Intestate Laws of this State if I had died without a will and without lineal heirs; excluding from said division and conveyance, Stephen Jones and any of his lineal heirs, and also excluding the children of my

deceased sister, Ann Ives, and their heirs. By the fore-going, I intend and will that the widow, if any, and the lineal heirs, if any, of my son, William Edward Sparks, and Stephen Jones, his lineal heirs, and the lineal heirs of Ann Ives, shall have no interest in the property bequeathed and devised in this item.

"Item. I do hereby give and grant to my said executor full power and authority to grant, bargain and sell at her discretion, as to time, manner and terms, any and all real estate of which I may die seized, possessed or in any manner entitled to, and to convey the same by good and sufficient deed or deeds to the purchasers there-of, and divide the proceeds thereof among the legatees aforesaid.

"Item. In the management and settlement of my estate it is my wish and direction that my executor shall employ Mary L. Trescott as attorney and counsel."

By a codicil, dated April 29, 1909, but not admitted to probate until January 10, 1911, the testatrix pro-vided as follows: "I direct that the house where I now reside shall be kept open by my executor, Sarah Carey, during the life time of my son, William Edward Sparks, and that she shall have the use and occupancy thereof during that time, without payment of rent."

The testatrix's son, William Edward Sparks, was a weak-minded person, who, apparently, had for his guardian the Stephen Jones, who was excluded in the will from sharing in the residue of the estate. The house, devised in the codicil to Sarah Carey for her life seems to have been conveyed to the latter by deed in Harriet Sparks' lifetime; proceedings referred to in the record point that way.

The decedent's personal estate was inventoried at $75,542.36, and real estate located in Nanticoke Borough was appraised for estate tax purposes at $12,000. At the time of her death it was rented to two tenants for $1,200 a year, $600 from each.

On November 2, 1910 the accountant filed what she termed "First and Partial Account of Sarah Carey, Executor and Trustee under the will of Harriet Sparks, deceased." It was really her account as executor, and should have been so designated.

The account showed conversion of but $5,000 of the securities inventoried as belonging to the estate, but the executor took credit for commissions of $3,954.25, full 5% on the debit items in the account, $79,085.08—including the unconverted inventory investments; and she also took credit for $1,500 paid her attorney, Mary L. Trescott. The balance shown by the account of personalty was $72,507.25. A real estate account annexed to the account showed receipt of rents of $1,300, and disbursements, including accountant's commissions of $65, of $322.44, leaving a balance of $977.56, which added to the personalty balance of $72,507.25, amounted to $73,505.39. Out of this the accountant reported having paid legacies of $5,032.83, and made payment to Stephen Jones, guardian of William Edward Sparks, for maintenance of ward and his (Jones') wages as attendant, of $2,296.90, leaving a balance on hand of $66,175.66. The account was confirmed without exception and audited March 3, 1911, and a balance of $64,571.78 was awarded to the accountant as Trustee for the uses declared in the will, of which $500 represented the Jenkins Trust, $500 the Carey Trust, and the balance, $63,571.78 was awarded to her as trustee under the residuary clause of the will. It developed that an error of $125 had been made by a double charge of interest in the inventory and account, and this residuary trust fund should have been that much less, or $63,446.78.

After expending about $4,000 in the permanent improvement of the Nanticoke real estate, the trustee advertised it for sale and on December 6, 1921 sold it at private sale to William Challenger, for $30,000, his being the highest offer received from three or four ap-

plicants. (584a) At the time, she filed no account of the moneys so received, nor of the income and disbursements to that date, but she paid herself 3% commissions on the selling price, $900, and 5% commissions on the rents received, $14,323.50, amounting to $716.18, and she paid her attorney, Miss Trescott, a fee of $1,000 for her services in connection with the sale. Including the cost of the above improvements, the expenditures for taxes, water rent and repairs amounted to $8,721.64. She should have reported the sale to the court, filed an account and had the net proceeds in her hands, as settled by the court, awarded to her under the trust clause of the will.

The income from the trust estate and the rentals from the real estate were much more than was required for the care and maintenance of the weak-minded son. This left a considerable balance every year. Instead of filing an account and allowing the court to order the disposition of this surplus income which was accumulating over and above the amount necessary for the care and maintenance of the incompetent son,—(See *Lowe's Est.*, 326 Pa. 375, 197 A. 405, on the validity of such accumulations),—the trustees mingled it with the principal of the trust estate, investing and reinvesting it until its identity, as principal or income, was lost.

On April 21, 1932, William Edward Sparks died and it became the duty of the trustee to file her account and make distribution of the balance in her hands, under the order of the court, in accordance with the above-recited provisions of the will, as soon as possible.

On February 4, 1933, Sarah Carey filed what she designated the "Second, partial account of Sarah Carey, Executor and Trustee under the will of Harriet Sparks, of the goods and chattels, rights and credits which were of said Harriet Sparks, late [etc.] ...... to and including February 1, 1933." It was really entirely a trustee's account, except that she included in it a statement of

the sale of the real estate on December 6, 1921, for $30,000, along with an itemized account of the rents received from the real estate from September 10, 1910 to May 3, 1921, amounting to $14,323.50, and of the disbursements in connection therewith, $10,621.64 including therein the expenditures for taxes, water rent and repairs and the commissions and attorney fees beforementioned incident to the sale—but not including trustee's commissions on the rents, which seem to have been charged against the personal estate. See Record pp. 307a-329a. This part of the account should have been filed and audited eleven years before.

The account so filed takes up 290 printed pages of the record, but was presented in a most unsatisfactory manner. The three trust funds were not accounted for separately, but were treated as one. The so-called account was not really an itemized account but rather a general summary or index of transactions, with references to a separate detailed or itemized ledger account of each security. The debit and credit items were not accounted for chronologically so that it would be possible to determine from the account the status of the estate at any given date. Principal and income were inextricably mingled. The account should have been separated into Principal and Income Accounts. The former should have charged the accountant with the trust fund awarded to her by the audit of March 3, 1911, and as this consisted almost entirely of securities included in the inventory, she should have charged herself with any gains received from the sale or conversion of these securities and taken credit for any allowable losses resulting therefrom. Any investments added to the principal from the surplus income should have been entered on the debit side of the account, and the expenses and disbursements chargeable to principal should have been entered, chronologically, on the credit side of the account and the net balance would be the corpus

of the trust estate, represented by cash on hand and the itemized investments. A separate income account should have been filed showing on the debit side the income received, the date when and from what source received, entered chronologically, and on the credit side should have been entered all payments and expenses chargeable to income, showing the date paid and the nature of the payment, and also all sums paid for the care and maintenance of the cestui que trust, the weak-minded son; and as surplus income was transferred to principal for investment, these amounts should have been entered as credits, so that the net balance of cash on hand and uninvested added to the cash and investments belonging to the corpus would constitute the entire estate.

Nothing of this sort was done. It would probably take a public accountant weeks to go over the 'account' as filed and bring it into proper order and shape. To give just one example of the inaccurate and unsatisfactory nature of the account as filed, take the item of Peoples Bank stock. This was a security owned by decedent at her death. It was appraised in the inventory at $11,375 and was part of the trust fund turned over to the accountant, at that figure. It has not been sold and is now represented by 84 shares of stock of the Miners Bank, with which the Peoples Bank was merged, and is still held by the trustee unconverted. On the audit it was admitted that the market value of this stock was then less than the appraised value, but in the account, as first filed, it is carried at $16,800, on the basis of an alleged book value of $200 per share; and accountant's counsel, Miss Trescott, insisted to the last that they were justified in so doing.

Exceptions were filed to the account by one of the collateral relatives of the decedent, entitled to share in the estate, with special reference to the commissions charged by the accountant and the credits claimed for

payments to her attorney, Miss Trescott. At the time the account was filed the balance of cash on hand for distribution amounted to only $10,824.43.[1]

The account was so badly and imperfectly prepared that it was agreed that a re-stated Trustee's account should be filed. This was done on January 23, 1935 and exceptions were filed to it within the time limited by the court. The grounds of exception were practically the same.

The re-stated account was an improvement over the account as originally filed, but there was a duplication and even triplication of items, in an attempt to make the sum total of the transactions appear larger than they really were, which is not to be approved; and it does not present the account in itemized, chronological order in the manner we have above outlined as proper.

The account may be re-arranged and summarized as follows:

| | | | |
|---|---|---|---|
| PRINCIPAL—corrected award as per audit ...... | | | 63,446.78 |
| Gain on sale over inventory ................ | | | 2,636.60 |
| | | | 66,083.38 |
| Loss on sale ............................ | | | 3,260.75 |
| Net .................................... | | | 62,822.63 |
| Sale of Nanticoke real estate .... | | 30,000 | |
| Less 3% commissions | 900 | | |
| Less Attorney fee .. | 1000 | 1,900 | 28,100.00 |
| | | Total .... | 90,922.63 |
| INCOME—Personalty | | | |
| From assets not converted, or before conversion | | | 40,325.55 |
| From corporate investments made by trustee .. | | | 2,457.87 |
| From mortgages & notes—invested by trustee .. | | | 64,026.50 |
| Savings bank interest ...................... | | | 1,821.32 |
| Miscellaneous ............................ | | | 243.98 |
| | | | 108,875.22 |

[1] By re-stated account, $10,853.28.

Less income of Jenkins & Carey Trusts, etc. .. 968.08

 107,907.14

INCOME—Real Estate

 (1) From Nanticoke real estate .. 14,323.50
 " " temporary mtge. int. 330.00

 14,653.50

Less expenditures ..... 8,721.64
 " 5% Trustee's comm.
 on rents, etc. ..... 732.68 9,454.32

 5,199.18

 (2) From real estate
 taken over from
 mortgagors 630.00
Less expen-
ditures ... 2,071.26
Trustee's
Comm. 5% 31.50 2,102.76

 Deficit .... 1,472.76 —1,472.76 3,716.42

 Total income ...... 111,633.56
Less expenditures ............. 7,787.01
Maintenance of ward .......... 40,255.19
Funeral of ward ............. 882.50 48,924.70

 Balance ...... 62,708.86
Less commissions claimed by trustee:
 5% income personalty ...... 5,459.09
 5% on gain over inventory .. 131.83
Annual fees paid attorney ...... 9,150.00 14,740.92

 Net income ...... 47,967.94
Add principal ........................... 90,922.63

 Total ............ 138,890.57
Less trustee's comm. on
 reinvestmnets—
 1½% on $253,927.82 3,808.92
Attorney fee ................. 15,000.00 18,808.92

 Balance as per restated account .... 120,081.65

This balance of $120,081.65 consisted of

| | | |
|---|---|---|
| Cash ............................... | | 10,852.28 |
| Unconverted corporate stock | 11,375.00 | |
| Corporate bonds ........... | 5,500.00 | 16,875.00 |

| | |
|---|---|
| Mortgages & notes—invested by trustee ........... | 67,875.91 |
| Real estate taken over by trustee .... | 24,478.46[2] |

120,081.65

During the progress of the hearing the accountant filed a supplemental account bringing the figures down to March 21, 1935.

| | |
|---|---|
| This showed a collection of principal of mortgages and notes of .................... | 33,020.38 |
| And a liquidating dividend on corporate bonds of | 400.00 |

33,420.38

| | |
|---|---|
| It showed real estate taken over by the trustee from six mortgagors since last account .. | 24,832.23[3] |

[2] The original investment in the mortgages, etc. on the real estate so taken over was $21,700.

[3] This figure includes the following items charged as payments in Personalty Income account, $9,461.34, infra:

| | |
|---|---|
| May 5, 1933. Paid Luther M. Kniffen, Sheriff balance taxes and costs Mazur property sale (431a) ................................... | 405.49 |
| See same item charged in Real Estate account (436a) ................................... | |
| December 7, 1933—Paid Luther M. Kniffen, Sheriff —taxes and costs, sale Miskel property (434a) | 182.31 |
| See same item charged in Real Estate account (437a) ................................... | |
| March 14, 1933—Paid Andrew Hourigan, Atty., taxes sheriff's costs, sale of Fleugel property (435a) ................................... | 529.43 |
| See same item charged in Real Estate account (437a) ................................... | |

1,117.23

The original investment in the mortgages, etc. on the real estate so taken over was $23,715.

The personalty income account showed
receipts of ................ 6,597.06
and disbursements, including
$1,800 paid Miss Trescott for
attorney fees, of ......... 9,461.34

Deficit .......... 2,864.28

The Real Estate income account
showed receipts of .......... 1,752.80
and disbursements of ...... 2,184.09

Deficit .......... 431.29

Total income account deficit .. 3,295.57

Summary

Cash on hand ........................... 10,852.28
Less the deficit, income account ............ 3,295.57

7,556.71
Add cash for converted securities .......... 33,420.38

Total cash on hand 3-21-35 40,977.09
Corporate stock, unconverted
(Miner's Bank) .......... 11,375.00
Corporate bonds ........... 5,100.00 16,475.00

Mortgage loans by trustee .. 8,995.01
Notes taken by trustee .... 2,530.10 11,525.11

Real Estate taken over by trustee .... 49,310.89[4]

Total Estate .......... $118,287.89

Exceptions were filed to the supplemental account, with special reference to the credits for payments to the attorney, Miss Trescott, $1,800. There were other matters objected to, but on the argument, the exceptions were limited to the Trustee's commissions and Miss Trescott's attorney fees.

---

[4] The original investment in the mortgages, etc. on all the real estate so taken over was $45,415. The balance represents prior liens, tax claims, costs and expenses paid.

We will consider them in that order.

(1) Taking up first the trustee's commissions, we are met at the outset with the express provision in the Act of March 17, 1864, P. L. 53, which was in force when this trust was created, (and is almost exactly re-enacted in the Fiduciaries Act of June 7, 1917, P. L. 447, sec. 45), as follows: "That in all cases, where the same person shall, under a will, fulfill the duties of executor, and trustee, it shall not be lawful for such person to receive, or charge, *more than one commission upon any sum of money coming into, or passing through, his hands, or held by him for the benefit of other parties;* and such single commission shall be deemed a full compensation for his services in the double capacity of executor, and trustee: Provided, That any such trustee shall be allowed to retain a reasonable commission on the interest he may receive from any sum held by him, in trust as aforesaid." See *Riter's Est.,* 260 Pa. 168, 103 A. 554; *Davidson's Est.,* 204 Pa. 381, 54 A. 273; *Middleton's Est.,* 66 Pa. Superior Ct. 55, 57, 63; *Barclay's Est.,* 2 W.N.C. 447, 448.

The trustee's commissions as claimed in the account were as follows:

| | | |
|---|---:|---:|
| 1—3% on sale of Nanticoke real estate | | 900.00 |
| 2—5% on income of Nanticoke real estate | | 732.68 |
| 3—5% on income from real estate taken over | | 31.50 |
| 4—5% on income from personalty, $109,181.60 | | 5,459.09[5] |
| 5—1½% on reinvestments: | | |
| Corporate bonds | 14,050.00 | |
| Mortgages and notes | 239,877.82 | |
| | 253,927.82 | 3,808.92 |
| 6—5% on gain over inventory, $2,636.60 | | 131.83 |
| Total | | $11,064.02 |

Payments had been made to her as follows (345a-346a):

---

[5] Amount claimed in account as first filed—5% on $112,375.40, $5,618.77.

| | |
|---|---|
| May 1, 1913 | $1,500.00 |
| Dec. 2, 1914 | 200.00 |
| Aug. 1, 1916 | 400.00 |
| Aug. 1, 1917 | 450.00 |
| Oct. 1, 1918 | 375.00 |
| Sept. 4, 1919 | 325.00 |
| Mar. 14, 1921 | 421.00 |
| Mar. 15, 1922 | 400.00 |
| June 1, 1923 | 400.00 |
| Apr. 1, 1924 | 400.00 |
| June 1, 1925 | 400.00 |
| Mar. 16, 1926 | 765.00 |
| Dec. 1, 1926 | 300.00 |
| Mar. 16, 1927 | 238.00 |
| Mar. 15, 1928 | 435.00 |
| Mar. 14, 1929 | 521.00 |
| Nov. 1, 1929 | 100.00 |
| Mar. 15, 1930 | 251.00 |
| Nov. 1, 1930 | 100.00 |
| Jan. 31, 1931 | 335.00 |
| June 22, 1931 | 50.00 |
| Mar. 14, 1932 | 324.27 |
| Feb. 1, 1933 | 1,501.60 |

Total ...... $10,191.87

To most of these commissions as claimed, except as they may be affected by the payments made by the Trustee to her attorney, Miss Trescott, and the losses from improper investments, there can be no valid objection. This applies to classes 1, 2, 3 and 4. The 5th and 6th items are in a different category. On the adjudication of the account the court surcharged the trustee with $3,778.99, the amount of commissions on the personalty which had been paid the accountant in her executor's account, as representing a double payment; but on exceptions to the adjudication filed by the accountant the court sustained the exception and revoked the sur-

charge, saying, "This Exception is sustained, as the Trustee, in her Supplemental Account, made no claim for commissions on the principal, claiming only commissions on the income and re-investments and proceeds derived from the sale of securities."

The error of the court below was in failing to recognize that one who acts as executor and trustee under a will, and who has received, as executor, full commissions on the estate awarded to him as trustee, is not entitled to charge commissions on reinvestments of the principal, nor on investments or reinvestments of surplus income on which he has received his commission. By express statutory provision the commission retained by and allowed this trustee on income received from the trust fund is the only commission she is entitled to receive "upon any sum of money coming into or passing through [her] hands or held by [her] for the benefit of other parties"; and this applies to all reinvestments whether of principal or surplus income. If it were otherwise a trust estate could soon be depleted by frequent reinvestment of the principal by the trustee. And the rule is not altered by the circumstance, present in this case, that the income from the trust fund was greater than was necessary for the maintenance of the testatrix's son. That only served to conceal the fact that such a charge is actually on the principal of the estate and is forbidden by the act of assembly before referred to. It would be clearly apparent in cases where the entire income from the trust is bequeathed to a life tenant. The cases cited above, *Riter's Est.*, 260 Pa. 168, 103 A. 554; *Davidson's Est.*, 204 Pa. 381, 54 A. 273; and *Middleton's Est.*, 66 Pa. Superior Ct. 55, 57, 63, and many other cases establish this. In *Middleton's Est.*, where objection was made to the five per cent commissions charged on the corpus of the estate by an executor, who was also named trustee under the will, Judge GEST, whose opinion in the adjudication of

the estate was approved by this court, said: "No matter how long the trust may continue, the trustee cannot at its termination charge any further commissions on the principal of the estate ...... Surely 3 per cent. would be a meagre allowance for the responsibility and labor of the executor during the year of administration, and for that also which will continue thereafter for the lifetime of the cestui que trust. The will directs that reinvestments be made in legal securities, and it is not always easy to find mortgages that shall be satisfactory both as to security and rate of interest." This is also an answer to the statement by the accountant's attorney on the hearing in the court below that when the corpus of the trust estate was turned over, commissions would be claimed on that (594a). There is no warrant in law for the allowance of commissions to a trustee for reinvestment of the securities of a trust estate. That is covered by his commissions on the income received from investments. The accountant is surcharged $3,808.92 on this item. At the argument counsel for the accountant attempted to excuse this charge by referring to the direction in the will that the executor should provide for her son, "the same as a prudent parent would provide for his child." The testatrix was referring to the expenditures for her weak-minded son's maintenance. It has no reference to the claim under consideration. The ward was not kept or looked after in the home of the accountant, but by Stephen Jones, while he lived, and at the Pennsylvania Hospital and the Danville Asylum, after Jones' death. A surcharge is also entered on the commissions on sale of securities over inventory value, $131.83. These securities were not sold by the accountant as executor. They were turned over to her in kind as part of the trust estate. Some securities so received were sold for more than they were inventoried as part of the decedent's estate; some for less. The cases cited above rule that a *trustee* is not entitled to commis-

sions on the enhanced value of stocks and other investments on which commissions had been charged and allowed in the executor's account. See *Riter's Est.*, supra; *Davidson's Est.*, supra.

(2) We come, then, to the exceptions relating to the attorney fees paid Miss Trescott.

The fees paid by the trustee to her attorney since the adjudication and audit of the executor's account, are as follows:

1—For services in sale of Nanticoke real
 estate .......................... 1,000.00
2—Annual retaining fees to filing of account ........................ 9,150.00[6]
3—Attorney fee charged in account ..... 15,000.00
4—Annual retainer in supplemental account ......................... 1,800.00

Total $26,950.00

To the first, the fee for services in the sale of the Nanticoke real estate, no objection can be taken, except that it should have been presented and settled in an account filed directly after the settlement, December 6, 1921.

As to the so-called 'annual retaining fee', the court below took an erroneous view of the matter, when it said on the hearing, (p. 579a), "As far as the retaining fee is concerned, that is outside anything the lawyer may see fit to charge for services rendered. That is exactly what the words says: 'Retaining fee'."

With all due respect to the learned court below, a trustee has no right or authority to pay an attorney except for *services* in the administration of the trust, and then only the fair and reasonable value of the services. While denominated in the account, 'annual retaining fee', it can only be sustained as a charge against the

---

[6] At the rate of $300 per year to January 1, 1924; and $600 per year thereafter.

estate, by way of payment for services rendered. To hold that a trustee can pay an attorney, out of the trust estate, seven and a half per cent of all the income received from the trust fund over a term of twenty-two years, for the mere privilege of retaining the attorney to act for the trustee, and not by way of services rendered in the administration of the trust estate, does not warrant serious consideration. We shall therefore consider these fees in connection with the attorney fee of $15,000 charged in the account.

The court refused to surcharge the accountant with any part of the fees paid her attorney, because five reputable members of the bar testified that in their judgment the services were worth $27,000, and none testified that the fees charged were excessive. We realize the weight and value of such testimony, but we also realize how unwilling most lawyers are to testify against the fees charged by fellow attorneys. Judges, who act as triers of fact, no less than jurors, (*Saxman v. U. S. Fire Ins. Co.*, 317 Pa. 13, 175 A. 394; *First Nat. Bank v. Monarch Fire Ins. Co.*, 123 Pa. Superior Ct. 298, 308, 187 A. 69) are allowed the use of their reasonable judgment, and are not required to accept conclusions which are grossly contrary to such reasonable judgment, based on established precedent; and especially is this the case, when, as here, the testimony of the legal witnesses was based upon assumptions and evidence which have proved to be without sufficient foundation in fact. The attorneys, who testified as to the reasonableness of Miss Trescott's fees, did so after hearing, or reading, her testimony as to the services performed by her, and their judgment was based on the evidence which she gave. If it turns out to be without substantial foundation, their testimony as to the value of her services necessarily is correspondingly affected.

Miss Trescott, in substance, testified (580a) that the trust estate had increased to about $230,000, or even

$239,000 (580a); that she had had from 20 to 30 interviews a month with the trustee concerning the estate; that the estate had been well managed, and the investments well and carefully chosen; that no losses had been incurred (591a); and that these results had been largely due to her constant care and watchfulness. Most of these assertions are now seen to have been made without sufficient foundation in fact. Despite the assertions of Miss Trescott—and the insistence of appellee's counsel in support of them, in their brief and on oral argument—, this estate never did increase to $230,000 or anything like it. Of course, if you add to the principal of the trust estate all the income received for 22 years, the total items so debited may amount to $225,000 or $230,000, but the corresponding disbursements, by way of expenses and for maintenance of the ward, made during the period must be deducted to arrive at the worth of the estate, and this done, there never was a time from March 11, 1911 down to the filing of this account, on February 4, 1933, when the sum total of cash and securities, good, bad and indifferent, in the hands of the trustee ever exceeded $139,000. And this apparent increase was not due to any special skill on the part of Miss Trescott, but to the natural law that if the income exceeds the outgo, an increase results. The ordinary yearly income from the investments constituting this trust estate was from $2,000 to $2,500 in excess of the money needed to maintain William Edward Sparks, and in twenty years that alone would cause an increase of from $40,000 to $50,000,—without giving any consideration to the *compounding* effect of investing the surplus *income*—, and added to the net selling price of the Nanticoke real estate, $28,100, would fully account for the increase.

This was not an estate that involved intricate legal questions,—or at least they were not raised and settled during those 22 years. There was no litigation to speak

of. In the course of 22 years, so far as the evidence shows, only two mortgages were foreclosed at sheriff's sale, and two other properties taken over by the trustee from the mortgagors, etc. by voluntary deed. In the course of 22 years Miss Trescott made investments in nearly 100 mortgages, herself appraising the properties, examining the titles and drawing the mortgages, but in a majority of these cases she was paid for her services in searching the titles and drawing the papers by the borrowers (573a and 629a). If the trustee made anything like 20 to 30 calls a month, during these 22 years, on her attorney, it was not because of anything that was specially difficult about the estate, but was rather in the nature of a shifting of her duties as trustee to her attorney. If an attorney performs the active duties of the trustee, both of them are not entitled to receive the trustee's full compensation, which the ordinary rule limits to 5% of the income; what is thus transferred to the attorney should be deducted from the trustee.

But as it turns out, this estate was not even well and competently managed by Miss Trescott. While the will authorized the trustee to "invest ...... the personal property and the money derived from the rents or sale of my real estate in such securities as to my executor and her counsel may seem advisable, until after the death of my son, William Edward Sparks", this implies a reasonably careful exercise of legal discretion. It does not justify a lending of the estate's funds to the attorney herself. Yet at various times between April 11, 1914 and August 2, 1920, she borrowed from the trust estate, on judgment notes, not entered in the prothonotary's office, amounts aggregating $5,200; and on March 15, 1923, she borrowed $2,750 on mortgage, and in March, 1928, increased this mortgage to $17,000, the lien covering a double house with nine rooms on each side for which she had paid $9,500 in 1923 (585a), and

she was behind in her payments of interest (630a) when about to file this account. Her attorney fee of $15,000 was credited on this mortgage, reducing it to $2,000. She lent moneys of the estate on notes and judgment notes not entered (592a-593a) and some of it to people who, she knew, were not able to pay it back (550a-551a). She lent money on second mortgage (591a), and the estate was subsequently compelled to pay the prior lien (519a). She said she expected to pay some of these items (Camille Morgan note, $500, 551a, 639a; Scott note, $1,576, 640a-641a), but she never did, and is now dead, and their recovery from her estate is problematical to say the least.

The result of the management of this trust estate is best judged by the present condition of the estate. Three years after the weak-minded son died and the estate became distributable under the will, the estate had dwindled to the following securities:

Cash—$40,977.09.

Bank stock appraised at $11,375, but with a less market value.

Corporate bonds in default, $5,100, deposited with committees, and in course of liquidation, value problematical.

Balance six mortgages—$8,995.01.

Notes (4), $2,530.10, of which $2,076 are admittedly worthless. (551a, 639a, 640a, 641a).

And real estate taken over because of default in payment of interest on ten mortgages, aggregating $45,415, which properties are not producing sufficient income to pay taxes, insurance, and repairs, let alone any net revenue, and the loss on which will undoubtedly be great.

To hold that a result like this, when careful and prudent management would have shown an estate of from $130,000 to $140,000, for distribution to the residuary legatees, is deserving of compensation in the amount of

$26,000[7]—(over 21% of all the income received)—by way of attorney fees to the person largely responsible for this shrinkage of assets, is without warrant in fact and an abuse of legal discretion.

We are doubtful whether any considerable practical benefit will result to this estate from these surcharges. The trustee was not, in our opinion, guilty of any intentional wrongdoing; she relied too much on her attorney, who proved to be an unwise and unsafe counselor. But we are unwilling that it should stand unrebuked, as a precedent. We are of opinion that the sum of $11,950 is not only liberal and generous compensation for all the legal services performed by the attorney, but that it is more than a strict adherence to precedents would warrant and justify. We surcharge the accountant with $15,000 paid as an attorney fee by crediting that amount on Miss Trescott's mortgage. We further hold that the question of the accountant's own commissions, outside of the surcharges which we have ordered, shall await the final settlement of the estate.

The decree is reversed and the record remitted to the court below for further proceedings in accordance with this opinion. Moneys in hand should be ordered presently distributed irrespective of the collection of surcharges.

Costs on this appeal to be paid by the accountant.

Judge JAMES took no part in the consideration or decision of this case.

---

[7] Over and above fee of $1000 for Nanticoke real estate sale.